**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| J & S PROPERTIES, LLC, | ) | **Bankruptcy No. 13-70512-JAD** |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ | X | |
| | ) | |
| PHOENICIAN | ) | |
| MEDITERRANEAN VILLA, | ) | **Adversary No. 14-07004-JAD** |
| LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | **Related to Doc. #90** |
| | ) | |
| LISA M. SWOPE, TRUSTEE | ) | |
| OF THE BANKRUPTCY | ) | |
| ESTATE OF J & S | ) | |
| PROPERTIES, LLC, | ) | |
| JAMES FOCHT, and | ) | |
| J & S PROPERTIES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | X | |

<u>**MEMORANDUM  OPINION**</u>

The matter before the Court is the *Motion to Dismiss Complaint Against Trustee* (the "Motion") filed by one of the Defendants, Lisa M. Swope, Esquire, the Chapter 7 Trustee of the Bankruptcy Estate of J & S Properties, LLC )(the "Trustee").

By the Motion, the Trustee seeks to have the complaint against her dismissed on the grounds of quasi-judicial immunity. For the reasons more fully expressed below, the Court finds that the Trustee is protected by the doctrine of immunity and dismissal of the Complaint filed by Plaintiff Phoenician Mediterranean Villa, LLC against the Defendant Lisa M. Swope is appropriate under the unique facts and circumstances of this case.[1]

## I.

J & S Properties, LLC ("J&S") filed a Chapter 7 bankruptcy petition on July 10, 2013. The following day, Lisa M. Swope, was appointed as Chapter 7 Trustee.

This adversary proceeding has been highly contentious, with the plaintiff Phoenician Mediterranean Villa, LLC ("Phoenician") alleging that the Trustee, acting in concert with J&S and its principal- Mr. James Focht- wrongfully evicted Phoenician from its leasehold located at 1302-08 Logan Boulevard, Altoona, PA (the "Estate Property").

---

[1] This court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. In the context of this Motion, the matters complained of by the Plaintiff Phoenician Mediterranean Villa, LLC concern the Chapter 7 Trustee's conduct and administration of the estate. Accordingly, the matter is a core proceeding pursuant to 28 U.S.C. §§157(a)(2)(A) and (O). See Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242 (3d Cir. 1994); Schultze v. Chandler, 765 F.3d 945 (9th Cir. 2014)(creditor committee members' malpractice suit against creditor committee accountant was core proceeding where claims asserted were based solely on acts that occurred during estate administration.). To the extent that some or all of this matter is determined to be non-core (or a core matter subject to Article III of the U.S. Constitution), this Memorandum Opinion and the Order granting the Motion shall constitute the Court's proposed findings, conclusions and recommendation to the United States District Court for the Western District of Pennsylvania as the parties do not consent to entry of final judgment. See In re River Entertainment Co., 467 B.R. 808 (Bankr. W.D. Pa. 2012); Doc. #30, ¶¶12, 13.

While some facts may be disputed between the parties, the facts necessary for determination of the applicability of the quasi-immunity defense are generally not in dispute.

Specifically, from the petition date up to at least January 15, 2014, Phoenician was in possession of the Estate Property as it was the tenant occupying the premises by virtue of a lease agreement (which the Trustee previously rejected by way of an order of the Court dated November 5, 2013).

The record reflects that the Trustee sought to reject the lease because the Trustee desired to sell the Estate Property.  Phoenician, however, opposed the Trustee's placement of a "for sale" sign on the premises.  Indeed, at times up and until the Court authorized the rejection of the lease in November of 2013, Phoenician refused to cooperate with the placement of such a sign by the Trustee (or her real estate broker) to market the sale of the Estate Property to the general public.  During this time period and thereafter, however, Phoenician (through its principal Mr. Husam Obeid) was interested in purchasing the property albeit at some price that less than what the Trustee thought was the market value of the Estate Property. (See *Transcript of November 5, 2013 Hearing* at pp. 23-40 (Bankruptcy No. 13-70512-JAD at Dkt. #189); *Transcript of January 24, 2014 Hearing* at p. 76 (Adversary No. 14-7004-JAD at Dkt. #40)).  In addition, Phoenician desired to remove items of personal property from the leasehold over

the objection of the Trustee (who had concerns regarding the fact that ownership of the assets had yet to be sorted out in the Bankruptcy Court). Id.

Against this backdrop, the events giving rise to Phoenician's claim of wrongful eviction arose. In this regard, the record reflects that in early January of 2014 the city of Altoona was hit with below freezing temperatures. Given the artic blast that hit the region, the Trustee had some concerns regarding the preservation and protection of the Estate Property.

At a January 24, 2014 hearing on a request of Phoenician for injunctive relief, the Trustee testified under oath that Mr. Focht informed her that the restaurant was shut down and that he was concerned about the heat at the premises. Mr. Focht also informed the Trustee that insurance had been cancelled at the premises. *Transcript of January 24, 2014 Hearing* at p. 148 (Adversary No. 14-7004-JAD at Dkt. #40)).

As a result, the Trustee requested that Mr. Obeid, a contractor invited by Mr. Focht, and counsel to Mr. Obeid meet her at the premises on January 3, 2014 so that the Estate Property could be adequately preserved during the anticipated arctic blast. The Trustee testified that at that meeting Mr. Obeid did not dispute that he was considering closing of his business, buying the building, or purchasing some other property to house his restaurant. Id. at 148-149. In addition, Mr. Obeid was

adamant that all the property inside the premises was his to the exclusion of everyone else, even though no determination of ownership had yet to be made by the Bankruptcy Court. Id. at 149.

At that juncture, the Trustee had no key to the premises.  In addition, at that juncture, the relationship between Mr. Focht and Mr. Obeid had deteriorated to such a degree that neither party trusted the other.  In fact, Mr. Obeid had concerns regarding whether Mr. Focht was going to take Phoenician's alleged property. Id. As a result, Mr. Obeid instructed that he desired that Mr. Focht have no access to the leased premises. Id. at 151.  The Court would parenthetically note that perhaps Mr. Obeid's concern here was justified, as Mr. Focht (who through other corporate entities owned a neighboring building and adjacent parking lot) went to great lengths (such as placing concrete barriers in the adjacent parking lot) to make business operations difficult for Phoenician.  No matter what, it is uncontested that the Trustee found herself essentially caught between this dispute between warring factions all the while she needed to protect the bankruptcy estate's largest asset.

At the January 3, 2014 meeting, Mr. Obeid furnished the Trustee with a key to the front door of the premises and, to ensure that the pipes did not freeze, the contractor suggested that the temperature be set inside the building at a temperature of at least 60 degrees Fahrenheit.

Mr. Obeid, however, did not place the temperature at 60 degrees. The testimony is that he set the thermostat at some temperature less than the temperature recommended by the contractor. Ultimately, by January 13, 2014, the pipes burst and the Estate Property was flooded. Id. at 153.

The flood caused a flurry of activity by the Trustee, Mr. Focht and Mr. Obeid. Id. at 152-163. Mr. Obeid apparently contacted a disaster restoration company, named ServiceMaster, who ultimately refused to remediate the premises citing many factors including: problems of insurance coverage, the acrimony between the parties, and that no one agreed to provide the restoration company with a lien on the Estate Property to the extent any fees went unpaid. Id. at 163.

As a result, the Trustee requested that the parties meet at the premises on January 15, 2014 to assess the situation and determine the status of insurance and how remediation could begin immediately. At the January 15, 2014 meeting at the premises, neither Mr. Obeid nor his counsel appeared. Despite the urgent nature of the situation occasioned by the bursting pipes, Mr. Obeid through counsel requested that the meeting be "rescheduled." They also indicated that they did not want Mr. Focht in the premises as they did not want Mr. Focht to take any property that was located at the premises.

Given the urgent nature of the situation, the Trustee declined the "rescheduling" request of Mr. Obeid and proceeded to attempt to inspect the premises. Once the Trustee arrived, she found that she had no access to the premises because an interior door was surprisingly locked and Mr. Obeid did not provide the Trustee with a key to this additional door. Id. at 169-70. As a result, Mr. Focht caused the locks to be replaced, and provided the Trustee with the key.

It is the fact that the locks were changed and the Trustee had the sole key that is the gravamen of Phoenician's cause of action against the Trustee. Thereafter, the Trustee maintained control of the premises and was only willing to provide parties-in-interest with supervised access to the property while it was remediated (and while disputes as to ownership of personal property were adjudicated or resolved)--- although there is dispute as to whether Phoenician ever requested access to the premises after January 15, 2014. The record reflects that the Trustee has testified by way of affidavit that Mr. Obeid and Phoenician never requested access to the premises after January 15, 2014; and Mr. Obeid has filed an affidavit whereby he avers that he requested access which was denied. However, resolution of this issue is irrelevant for purposes of deciding the Motion on immunity grounds.[2]

---

[2] See Picard v. Chais et al. (In re Bernard L. Madoff Inv. Sec. LLC), 440 B.R. 282 (Bankr. S.D.N.Y. 2010)(citing Weissman v. Hassett, 47 B.R. 462, 467 (S.D.N.Y. 1985)(stating that a trustee "should be shielded from liability for

## II.

On April 7, 2015, the Trustee filed her *Motion to Dismiss Complaint Against Trustee,* seeking to have the Complaint dismissed on the grounds of quasi-judicial immunity.   Thereafter, the Court took judicial notice of the evidentiary record made at numerous hearings before the Court and, accordingly, afforded the parties an opportunity to put the record in perspective by way of supplemental briefs or affidavits.   The Court also advised that it was considering the Motion to Dismiss pursuant Fed.R.Bankr.P. 7012 (which incorporates Fed.R.Civ.P. 12 into bankruptcy adversary proceedings)) and also Fed.R.Bankr.P. 7056 (which incorporates Fed.R.Civ.P. 56 into bankruptcy adversary proceedings as well). Because the supplemental filings are complete, the matter is now ripe for adjudication.

## III.

Summary judgment is to be granted if it shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).   A party genuinely disputing a fact must support such assertion by citing to particular parts of the record or show that the materials cited

---

his lawful exercises of judgment and discretion, even if, in hindsight, such interpretations were incorrect.   If immunity applied only to decisions that turned out to be proper, there would be no need for the doctrine of immunity.")

do not establish the absence or presence of a material fact. <u>See</u> Fed.R.Civ.P. 56(c)(1).  A dispute is genuine if there is sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).   Summary judgment is appropriate if no material, factual issue exists and the only issue before the court is a legal issue.  <u>EarthData Int'l of N.C., LLC v. STV Inc.</u>, 159 F. Supp. 2d 844 (E.D. Pa. 2001).  With these standards in mind, the Court concludes that no genuine dispute of material fact exists as to whether the Trustee exercised her business judgment as to the steps she deemed necessary to protect Estate Property.   Given that no genuine dispute of material fact exists in this regard, summary judgment is appropriate in favor of the Trustee as to the applicability of the doctrine of quasi-immunity.   As such, for the reasons expressed below, the Motion filed by the Trustee is appropriately granted.

## IV.

The parameters of a Chapter 7 Trustee's personal liability are not set forth in the Bankruptcy Code.  Regrettably, as other courts have observed, "the case law regarding trustee liability is extremely confusing and often contradictory, with the result that it is difficult from the case law alone to formulate guidelines specifying when a trustee is immune from personal liability and when he [or she] is not."

Kirk v. Hendon (In re Heinsohn), 231 B.R. 48, 64 (Bankr. E.D. Tenn. 1999) (citations omitted).

This Court has carefully considered a range of scholarship aimed at clarifying the underlying causes of the splintering of opinions and those proposing a jurisprudential remedy.[3]  Without question, the Barton doctrine is the most prominent source of confusion, as is manifest in the briefs submitted by the parties to the matter *sub judice,* despite the fact that this Court entered a Memorandum Order addressing the inapplicability of the Barton doctrine to the present adversary proceeding. (See Adversary No. 14-7004-JAD at Doc. # 84).   Accordingly, the Court deems it necessary to clarify why neither the Barton doctrine nor 28 U.S.C. § 959(a) apply to the matte currently before the Court.

The U.S. Court of Appeals for the Third Circuit discussed the historical origins and contemporary applicability of the Barton doctrine in In re VistaCare Group, LLC, 678 F.3d 218, 224-35 (3d Cir. Pa. 2012); see also James W. Day and

---

[3] See e.g., E. Allan Tiller, "Personal Liability of Trustees and Receivers in Bankruptcy," 53 Am. Bankr. L.J. 75 (Winter 1978); Daniel B. Bogart, "Liability of Directors of Chapter 11 Debtors in Possession: Don't Look Back--Something May Be Gaining on You," 68 Am. Bankr. L.J. 155, 202 (Spring 1994); Daniel B. Bogart, "Finding the Still Small Voice: The Liability of Bankruptcy Trustees and the Work of the National Bankruptcy Review Commission," 102 Dick. L. Rev. 703, 734 (1998); Louis M. Phillips & Ashley S. Green, "Musings on the Standard of Care Governing the Question of Trustee Immunity and Trustee Liability: Part 1" (Fall 2008), "Part 2" (Winter 2008), J. Nat'l Ass'n Bankr. Trustees; Theresa J. Pulley Radwan, "Trustees in Trouble: Holding Bankruptcy Trustees Personally Liable for Professional Negligence," 35 Conn. L. Rev. 525, 528-29 (Winter 2003); David P. Primack, "Confusion and Solution: Chapter 11 Bankruptcy Trustee's Standard of Care for Personal Liability," 43 Wm. & Mary L. Rev. 1297 (2002);

Marc E. Hirschfield, "The Barton Doctrine: Still Kicking after 130 Years," 31-7 Am. Bankr. Inst. J. 22 (August 2012).

In 1872, the U.S. Supreme Court, upon consideration of a breach of contract action between the appointed receiver for the Memphis, El Paso and Pacific Railroad Company and the Texas governor, pronounced that "[a] receiver is appointed upon a principle of justice for the benefit of all concerned . . . The court will not allow him to be sued touching the property in his charge, nor for any malfeasance as to the parties, or others, without its consent; nor will it permit his possession to be disturbed by force, nor violence to be offered to his person while in the discharge of his official duties." Davis v. Gray, 83 U.S. 203, 218 (1872) (citing De Groot v. Jay, 30 Barb. 483 (N.Y.S. 1859), and collecting cases); see 31-7 Am. Bankr. Inst.J. 22 (2012).

Nine years later, in 1881, in another case involving a railroad receivership, the U.S. Supreme Court addressed a personal injury lawsuit brought by an injured passenger (Frances Barton) against the receiver of the Washington City, Virginia Midland and Great Southern Railroad Company (John Barbour) in the Supreme Court of the District of Columbia, without first seeking leave of Virginia's Circuit Court for the city of Alexandria (which was the court that appointed Barbour). Barton v. Barbour, 104 U.S. 126, 127 (1881); see 31-7 Am. Bankr. Inst. J. 22 (2012).

In <u>Barton v. Barbour</u>, the District Court had dismissed Barton's complaint on the basis of lack of jurisdiction, pointing to her failure to obtain leave of the court that had appointed Barbour prior to bringing her suit. <u>Id</u>. The U.S. Supreme Court affirmed the dismissal of Barton's suit, citing <u>Davis</u> for the general rule, known in legacy as "the <u>Barton</u> doctrine," that "before suit is brought against a receiver leave of the court by which he was appointed must be obtained." <u>Id</u>. at 128.

The majority opinion in <u>Barton</u> explained the necessity of the appointing court's approval in order to avoid plaintiffs from obtaining an "'advantage over the other claimants' as to the distribution of 'the assets in the receiver's hands.'" <u>In re VistaCare Group, LLC</u>, 678 F.3d 218, 224 (3d Cir. 2012) (quoting <u>Barton</u>, 104 U.S. at 128). The <u>Barton</u> Court explained that the requirement also was necessary to "prevent the 'usurpation of the powers and duties which belonged exclusively to the appointing court' and protect 'the duty of that court to distribute the trust assets to creditors equitably and according to their respective priorities.'" <u>Id</u>. at 225 (quoting <u>Barton</u>, 104 U.S. at 136).

Justice Miller's dissent in <u>Barton</u>, expressed a concern that receivers should not be insulated from liability for violating state or local laws *while managing an operational business*, and plaintiffs should not be denied the right to trial by jury. <u>Barton</u>, 104 U.S. at 137-40 (emphasis added).  Justice Miller's concerns were addressed six years later with the passage of 28 U.S.C. § 959(a), which provides:

- 12 -

Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions *in carrying on business connected with such property*.  Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

28 U.S.C. § 959(a) (emphasis added).

Section 959(a) protects the right to trial by jury and permits trustees, receivers and managers of property to be sued without leave of the court that appointed them "with respect to any of their acts or transactions *in carrying on business* connected with such property." Id. (emphasis added).

In the present adversary proceeding before this Court, Phoenician incorrectly characterizes Ms. Swope's activities as carrying on business connected with the bankruptcy estate.  It is widely recognized that section 959(a) applies to situations "such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store'" and is inapplicable "to suits based on actions taken to further the administering or liquidating the bankruptcy estate." Coen v. Stutz (In re CDC Corp.), 610 Fed. Appx. 918 (11th Cir. 2015)(citations omitted);  In re VistaCare Group, LLC, 678 F.3d at 227 (3d Cir. 2012)("where a trustee 'acting in his official capacity conducts no business connected with the property other than to perform administrative tasks necessarily incident to the consolidation, preservation, and liquidation of assets in the debtor's

estate,' § 959(a) does not apply")(quoting <u>Lebovits v. Scheffel (In re Lehal Realty Assocs.)</u>, 101 F.3d 272, 276 (2d Cir. 1996)).

There is nothing to suggest that Ms. Swope, in exercising her duties as a Chapter 7 Trustee, was performing anything other than tasks necessarily incident to the consolidation, preservation, and liquidation of assets in the debtor's estate. While attempting to characterize Ms. Swope's conduct as "carrying on business" in the context of section 959(a) is inaccurate and misleading, it is ultimately of no moment in the present dispute.

The Court reaches this conclusion because the <u>Barton</u> doctrine involves jurisdiction, not substantive law. If a plaintiff wants to bring suit against a bankruptcy trustee in a forum other than the bankruptcy court, the <u>Barton</u> doctrine requires approval of the bankruptcy court in order to proceed in the alternate forum. The scholarship on the <u>Barton</u> doctrine reveals that a common source of confusion springs from misconstruing it as shielding trustees from lawsuits. Such a misunderstanding naturally leads to confusion about whether the <u>Barton</u> doctrine affords trustees immunity. However, that is contrary to the fact that <u>Barton</u> presents a jurisdictional question. Simply stated, the <u>Barton</u> doctrine does not shield trustees from lawsuits. Rather, the doctrine requires the bankruptcy court to determine *where* the suit may be brought, not *whether* the trustee may be sued. <u>Katz v. Kucej (In re Beibel)</u>, No. 08-3115, 2009 Bankr. LEXIS 1544, 2009 WL

1451637, at *6, n.18 (Bankr. D. Conn. May 20, 2009)(unreported decision)("The

Barton Doctrine is jurisdictional. Quasi-judicial immunity is substantive. They are

not the same thing."); In re Cutright, 2012 Bankr. LEXIS 2419, *26 (Bankr. E.D.

Va. May 30, 2012)("The Barton Doctrine pertains to 'where the Trustee may be

sued (i.e., in this court only), not whether she may be sued.'"(citing In re Beibel,

2009 Bankr. LEXIS 1544, [WL] at *6).

A second source of confusion arises from the fact that, when presented with

a Barton doctrine scenario, the reviewing bankruptcy court determines whether

there is any basis for the suit to proceed in another forum.   In addition to

considering whether a plausible cause of action has been alleged by the plaintiff, a

bankruptcy court may, but is not required to, consider whether the trustee should

enjoy immunity as a basis for disallowing the matter to proceed in another forum.

See e.g., In re Weisser Eyecare, Inc., 245 B.R. 844, 848 (Bankr. N.D. Ill. 2000)

(holding that trustee's immunity defeated movant's prima facie case, therefore

denying leave to sue the trustee); c.f., In re Cutright, 2012 Bankr. LEXIS 2419, 34-

35 n.11 (Bankr. E.D. Va. May 30, 2012)(declining to "combine the issues because

the question of whether the plaintiff has stated the elements of a prima facie case

focuses on whether the party seeking affirmative relief has presented sufficient

facts to establish the elements of his claim, whereas immunity from liability would

be a possible defense for a trustee to raise in opposition to a plaintiff's claim.").

To further illustrate this point, if Phoenician had approached this Court seeking approval under the <u>Barton</u> doctrine to proceed against Ms. Swope in state court, this Court may have found itself with the same issue of whether Ms. Swope enjoys immunity.  But the Court would then be engaged in an immunity analysis for the purpose of determining whether the case may proceed to state court, and not necessarily to make a substantive determination regarding whether Ms. Swope is in-fact entitled to immunity. Again, a frequent misstep is to confuse a *jurisdictional immunity analysis* with a *substantive immunity analysis*.

Section 959(a) simply operates as a statutory exception to the <u>Barton</u> doctrine requirement of obtaining prior bankruptcy court approval.  However, in the present matter, Phoenician filed its action against Ms. Swope in this Court and is not seeking approval to proceed in another forum.  As this Court previously held, there is no <u>Barton</u> doctrinal jurisdictional determination to be made by this Court because the <u>Barton</u> doctrine does not apply to this case.  The consideration of section 959(a) is appropriate only when it appears that applying the <u>Barton</u> doctrine would otherwise prevent a plaintiff from proceeding in another forum.  In this present adversary proceeding, it follows from the inapplicability of the <u>Barton</u> doctrine that there is no need to determine whether section 959(a) operates as an exception to it.

There is also an underlying policy concern that was conveyed by the Seventh Circuit in a frequently cited passage in <u>In re Linton</u>, 136 F.3d 544, 545-546 (7th Cir. 1998):

> This concern is most acute when suit is brought against the trustee while the bankruptcy proceeding is still going on. The threat of his being distracted or intimidated is then very great . . . [w]ithout the requirement, trusteeship will become a more irksome duty, and so it will be harder for courts to find competent people to appoint as trustees. Trustees will have to pay higher malpractice premiums, and this will make the administration of the bankruptcy laws more expensive (and the expense of bankruptcy is already a source of considerable concern). Furthermore, requiring that leave to sue be sought enables bankruptcy judges to monitor the work of the trustees more effectively. It does this by compelling suits growing out of that work to be as it were prefiled before the bankruptcy judge that made the appointment; this helps the judge decide whether to approve this trustee in a subsequent case.

> . . . At stake … is a concern … concern with the integrity of the bankruptcy jurisdiction.  If debtors, creditors, defendants in adversary proceedings, and other parties to a bankruptcy proceeding could sue the trustee in state court for damages arising out of the conduct of the proceeding, that court would have the practical power to turn bankruptcy losers into bankruptcy winners, and vice versa. A creditor who had gotten nothing in the bankruptcy proceeding might sue the trustee for negligence in failing to maximize the assets available to creditors, or to the particular creditor. A debtor who had failed to obtain a discharge might through a suit against the trustee obtain the funds necessary to pay the debt that had not been discharged.

In re Linton, 136 F.3d 544, 545-546 (7th Cir. 1998).


## V.


With that by way of background, this Court will now examine the issue of trustee immunity absent the fog of Barton.  Before looking to the case law, the Court is mindful that there are analogous policy considerations in the context of immunity to those in the jurisdictional context.  As expressed by the Bankruptcy Court for the Central District of California:

> Too little protection might expose a trustee to excessive personal liability and dissuade capable people from becoming trustees. Too much protection will not encourage responsible decision making on difficult estate management issues. So while removing any question of personal liability for ordinary negligence, there will be no disincentive to qualified people to serve as standing or panel trustees. But there are still some safeguards in the system to handle trustees who are negligent: (1) the bankruptcy code allows the creditors to vote out a trustee who is unsatisfactory and (2) the United States trustee can seek to remove a trustee from the panel if that trustee is not performing his/her duties in an acceptable fashion.

In re Cont'l Coin Corp., 380 B.R. 1, 7-8 (Bankr. C.D. Cal. 2007)(quoting the National Bankruptcy Review Commission Final Report, at 860-861)

Mindful that trustee immunity has important implications for the bankruptcy system and the public being served by that system, we look first to the U.S. Supreme Court's decision in <u>Mosser v. Darrow</u>, 341 U.S. 267 (1951).

In <u>Mosser</u>, the trustee allowed two of the reorganizing debtor's employees to purchase securities of the debtor's subsidiaries and resell them to the estate.  <u>Id</u>. at 269-73.  The <u>Mosser</u> Court found that the profit enjoyed by the employee-brokers resulted in a loss to the estate because their fees could have been earned by the estate had it acted as broker. <u>Id</u>.  In finding the trustee personally liable for $43,000 in lost profits, the Court explained:   "liability here is not created by a failure to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust." <u>Id</u>. at 272.

As noted by Professor Theresa Radwan, "the only clear conclusion that can be garnered from <u>Mosser</u> is that a trustee is personally liable for 'willful and deliberate' (defined as 'knowing') actions which result in a loss to the estate." Radwan, 35 Conn. L. Rev. at 528-29.   In the case *sub judice* there are no allegations that the Trustee engaged in any willful or deliberate actions that resulted in a loss to the estate.  Rather, the claims are one of wrongful eviction to a third-party--- Phoenician.  Thus, the narrow issue before the Court is whether these claims are subject to the doctrine of quasi-immunity.

- 19 -

In <u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. 429, 113 S. Ct. 2167, 124 L.Ed. 2d 391 (1993), the U.S. Supreme Court considered whether a court reporter would enjoy *absolute* immunity, setting forth a two-step process to determine whether immunity attaches to acts of others involved in the judicial process.  <u>In re Cont'l Coin Corp.</u>, 380 B.R. 1, 8-9 (Bankr. C.D. Cal. 2007).  The first prong in the <u>Antoine</u> analysis involves reviewing the "the immunity historically accorded the relevant official at common law and the interests behind it." <u>Antoine</u>, 508 U.S. at 432 (citing <u>Butz v. Economou</u>, 438 U.S. 478, 508, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978) (quoting <u>Imbler v. Pachtman</u>, 424 U.S. 409, 421, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)).  Under the second <u>Antoine</u> prong, there is a determination of whether the official's "judgments are "functionally comparable" to those of judges, involving the "exercise a discretionary judgment" as a part of their function." <u>Id</u>. at 436 (citing <u>Imbler v. Pachtman</u>, 424 U.S. at 423, n. 20).

The <u>Antoine</u> analysis was applied by the Ninth Circuit in <u>Curry v. Castillo (In re Castillo)</u>, 297 F.3d 940 (9th Cir. 2002), to determine whether a Chapter 13 Trustee was afforded *absolute* immunity from a suit arising from the Chapter 7 Trustee's failure to give notice of a hearing.  In the matter before the Ninth Circuit on appeal, it was not in dispute that "a bankruptcy trustee would enjoy absolute quasi-judicial immunity for judicial functions involving the exercise of discretionary judgment, such as the decision to schedule a bankruptcy confirmation

hearing." Id. at 946-7.  However, the question was whether immunity is afforded

"for purely ministerial acts, such as the failure to give notice of a hearing."  Id.

Thus, in Castillo, the Ninth Circuit addressed whether Antoine requires that

trustees perform actions "integrally related to the judicial process" and requires "an

examination of the nature of those functions." Id. at 946-7.

In undertaking the historical analysis prong of Antoine the Ninth Circuit

began by recognizing that "Anglo-American common law has long recognized

judicial immunity [as] a 'sweeping form of immunity' for acts performed by

judges that relate to the 'judicial process' (quoting Forrester v. White, 484 U.S.

219, 225 (1988) and Imbler v. Pachtman, 424 U.S. 409, 423, n.20 (1976)), and

noted that "[a]bsolute judicial immunity is not reserved solely for judges, but

extends to nonjudicial officers for 'all claims relating to the exercise of judicial

functions.'" Castillo, 297 F.3d at 947 (citing  Burns v. Reed, 500 U.S. 478, 499

(1991) (Scalia, J., concurring in part and dissenting in part)).  The Ninth Circuit

went on to observe that, while "[t]he Supreme Court has been 'quite sparing in [its]

recognition of absolute immunity, and [has] refused to extend it any further than its

justification would warrant' (quoting Burns, 500 U.S. at 486-87) "the Court has

also guarded the 'traditional common-law protections extended to the judicial

process.'" Castillo, 297 F.3d at 947 (quoting Forrester, 484 U.S. at 225).

The Ninth Circuit provided an overview of the historical development of trustee functions, beginning in 1800, pursuant to the Bankruptcy Clause, U.S. Const. Art. I, § 8, cl. 4, which was inextricably tied with English bankruptcy law. Id. at 949 (citing Charles J. Tabb, "The History of the Bankruptcy Laws in the United States," 3 Am. Bankr. Inst. L. Rev. 5, 7 & n. 11 (1995)).

Under English bankruptcy law, the Lord Chancellor delegated the chancery function of supervising the bankruptcy process to commissioners, with a role similar to modern bankruptcy trustees and judges, such as "collecting, liquidating, and distributing the debtor's property to creditors, and more traditional judicial activities, such as seizing property, summoning persons to appear before them, and committing people to prison." Id. (citing 3 Am. Bankr. Inst. L. Rev. at 8-9).  Over time, the trustee-like functions were delegated to "'assignees' -- so called because the bankruptcy estate was assigned to them." Id. at 950.  Throughout the nineteenth century, the United States bankruptcy system, "was based on the contemporary English system of chancellor, commissioner, and assignee." Id.  U.S. District Courts had original jurisdiction of bankruptcy matters, with direction to appoint "registers in bankruptcy" to assist the district court judge. Id.  While "[t]hese registers were the predecessors of the twentieth century referee and bankruptcy judge[,] [a]ssignees, on the other hand, continued to carry out trustee-like functions in supervising the liquidation." Id. (citing 3 Am. Bankr. Inst. L. Rev. at 19).

In the context of the historical analysis prong of <u>Antoine</u>, the Ninth Circuit concluded that the common-law and nineteenth century antecedents of the modern bankruptcy trustee were "entrusted with both administrative and adjudicatory functions[;] therefore, *[t]o the extent the trustee performed the functions of a modern-day bankruptcy judge, immunity would have extended to the performance of these common-law adjudicatory functions*." <u>Id</u>. (emphasis added)(citing <u>Antoine</u>, 508 U.S. at 433-34 & n. 8).

The Ninth Circuit further observed that the duties of bankruptcy trustee "remained relatively constant" over the next two centuries. <u>Id</u>.  The court examined the contemporary bankruptcy structure, according to which regional U.S. Trustees are appointed by the Attorney General and charged with "the responsibility of supervising the administration of bankruptcy cases." <u>Id</u>.  The U.S. Trustee is responsible for supervising trustees operating "pursuant to legislative and judicial directives" which include "a wide variety of functions previously performed by bankruptcy judges." <u>Id</u>.  The Ninth Circuit characterized the U.S. Trustee as "the 'watchdog' of the bankruptcy system, charged with preventing fraud and abuse and with 'filling the vacuum' caused by possible creditor inactivity." <u>Id</u>. (citing  H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963).

At least in the Ninth Circuit, with respect to bankruptcy trustees, the issue was resolved as to the historical analysis prong of <u>Antoine</u>.  The Ninth Circuit's

analysis is compelling and it follows that there is no need to re-examine that factor on a case by case basis for bankruptcy trustees, absent a significant change in their statutory duties.  In light of the absence of any case or plausible theory concluding that bankruptcy trustees do not satisfy the historical prong of <u>Antoine</u>, this Court sees no reason to disturb it.  Indeed, this explains the subsequent disappearance of the historical-prong <u>Antoine</u> analysis in the case law addressing trustee immunity, other than by way of doctrinal background context as appearing here.

However, it is with respect to the second prong of <u>Antoine</u>—the functionality prong—that the subsequent case law emerged and diverged with respect to categories of actions to which a trustee would enjoy immunity.  In <u>Castillo</u>, the Ninth Circuit proceeded to review the "statutory duties of a bankruptcy trustee operating under the aegis of the U.S. Trustee are enumerated in 11 U.S.C. § 704, 1302, 1304," observing that "the trustee is to gather and liquidate the property of the estate, to be accountable for the estate, ensure that the debtor performs his or her obligations, investigate the finances of the debtor, review the proofs of claim, and where appropriate, oppose the debtor's discharge, be available to provide relevant information to parties-in-interest, and by court order, operate the business on a short-term basis" and also "prepare the final report and an accounting for the administration of the estate." <u>Id</u>. at 950-51.  Accordingly, the Ninth Circuit recognized that "Congress created a hybrid official" given that "[j]ust

as in the nineteenth century (and earlier) the bankruptcy trustee performs both adjudicatory and administrative functions."[4] Id at 951. Given that "the trustee is charged with many legal, adjudicative, clerical, financial, administrative, and business functions," and given that the second prong of Antoine can be read to establish that "quasi-judicial immunity attaches to only those functions essential to the authoritative adjudication of private rights to the bankruptcy estate," the Ninth Circuit proceeded to examine "the particular *function*" at issue before it. Id. (emphasis added).

In Castillo, the Ninth Circuit reversed the BAP on the basis that it "went astray by segregating what is essentially one function -- controlling the docket -- into two discrete tasks." Id. at 951. The court rejected the interpretation of Antoine that "judicial acts that are part of the judicial function are excluded from absolute immunity because they could be characterized as nondiscretionary or even

---

[4] As set forth above, the historical antecedent to the modern day bankruptcy judge is the commissioner in bankruptcy—which was established by the first bankruptcy statute in 1800. In 1800, the bankruptcy statute provided for a judge of the district court to appoint commissioners whose powers and duties included the:

> …power to take into their possession, all the estate, real and personal, of every nature and description to which the said bankruptcy may be entitled, either in law or equity in any manner whatsoever, and cause the same to be inventoried and appraised to the best values . . . and also to take into their possession, and secured, all deed and books of account, papers and writings belonging to such bankruptcy; and shall cause the same to be safely keep, until assignees shall be chosen or appointed, in manner hereafter provided.

See 2 Stat. 19 1799-1813, Sec.5.

ministerial. … [T]he fact that the activity is routine or requires no adjudicatory skill renders that activity no less a judicial function." Id. at 952 (quoting Wilson v. Kelkhoff, 86 F.3d 1438, 1444 (7th Cir. 1996)).  This conclusion was supported by the policy consideration that "[t]he concern for the integrity of the judicial process that underlies the absolute immunity of judges is reflected in the extension of absolute immunity to certain others who perform *functions closely associated with the judicial process*." Id. (emphasis added)(quoting Moore v. Brewster, 96 F.3d 1240, 1244 (9th Cir. 1996)).  According to the Ninth Circuit, "when determining whether a function is judicial in nature, a court must focus on the 'ultimate act' rather than the constituent parts of the act." Id.

The ensuing case law demonstrates patterns of agreement as well as sources of confusion.  There is almost universal agreement that bankruptcy trustees are entitled to judicial immunity from personal liability for acts taken within their authority as court officers. Barbee v. Price Waterhouse, LLP (In re Solar Fin. Servs.), 255 B.R. 801, 803 (Bankr. S.D. Fla. 2000)(citing Royal Ins. Co. v. P.S.I. Agency, Inc. (In re Clearwater Bay Marine Service), 236 B.R. 285 (Bankr. M.D. Fla. 1999));. TTT Hope, Inc. v. Hill (In re Powell), 2008 U.S. Dist. LEXIS 67719, *34-35 (S.D. Tex. Sept. 2, 2008).  When acting pursuant to an order of court, a bankruptcy trustee is generally afforded *absolute immunity*. See e.g., Boullion v. McClanahan, 639 F.2d 213, 214 (5th Cir. 1981); In re Center Teleproductions,

Inc.,112 B.R. 567 (Bankr. S.D.N.Y. 1990)(trustee granted absolute immunity from action brought by a tenant of property where trustee acted pursuant to court order); In re XRX, Inc., 77 B.R. 797 (Bankr. D. Nev. 1987); Lawrence v. Goldberg, 2008 U.S. Dist. LEXIS 124906, *31-32 (S.D. Fla. Feb. 12, 2008).   When not acting pursuant to an order of court, a bankruptcy trustee is generally afforded *qualified immunity*.   See e.g., In re Powell, 2008 U.S. Dist. LEXIS 67719, *35, Solar Fin. Serv., Inc., 255 B.R. 801, 803 (Bankr. S.D. Fla. 2000).

Here in the case involving Trustee Swope and Phoenician, the changing of the locks to the Estate Property was not undertaken pursuant to a court order. Accordingly, we must not confuse the *absolute immunity* analyses associated with actions taken pursuant to a court order with the *qualified immunity* analyses of actions undertaken absent an authorizing order of court.[5]

With respect to the subcategory of cases presenting an issue of qualified immunity, this Court is mindful of the contention by Professor Daniel Bogart that "courts confuse the doctrine of derived judicial immunity from suit, that protects trustees and other court officers against liability from suit by nonbeneficiaries of

---

[5]  This Court notes that Antoine was addressing *absolute* immunity, and left open the issue of whether *qualified* immunity would require the same analysis.  As an example of differences in the application of Antoine in this respect, see In Sullivan v. Sokolski, 1994 U.S. Dist. LEXIS 3753, *10-11 (E.D. Pa. Mar. 28, 1994)("In Antoine, the Supreme Court held that court reporters are entitled to qualified immunity for failing to produce transcripts of a criminal conviction.) and Thomas v. Mengel, 1996 U.S. Dist. LEXIS 2176 (E.D. Pa. Feb. 22, 1996)(Court Reporter Defendants do not enjoy immunity).  What superficially appear as contrary views can be reconciled by recognizing that Antoine denied *absolute* immunity to court reports while allowing *qualified* immunity to court reporters.

the bankruptcy trust, when acting within the scope of their authority, with standards of care that trustees owe to beneficiaries of the estate." Bogart, 68 Am. Bankr. L.J. 155, 202; see also, Kirk v. Hendon (In re Heinsohn), 231 B.R. 48, 65 (Bankr. E.D. Tenn. 1999); LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 7 (1st Cir. 1999)("Courts sometimes have blurred the important distinction between two types of actions against trustees: breach of fiduciary duty claims brought by parties interested in the administration of the estate, and claims in tort or contract brought by third parties.")(citing Sherr v. Winkler, 552 F.2d 1367, 1375 (10th Cir. 1977) as an example of "misapplying fiduciary principles to a tort action by a third party").

In the matter *sub judice*, as a Chapter 7 Trustee, Ms. Swope is a fiduciary for the debtor, shareholders, and creditors. However, Ms. Swope is not a fiduciary for Phoenician (at least as it relates to Phoenician's status as a tenant in the Estate Property). See Sweda Int'l v. Harris (In re 2001 Cincinnati, Inc. VIP Clubs of America., 43 B.R. 6, 7 (Bankr. S.D. Ohio 1984) (where plaintiff was not a creditor, the defendant-trustee owed no fiduciary duty to plaintiff) (citing Ford Motor Credit Co. v. Weaver, 680 F.2d 451, 462 n. 8 (6th Cir. 1982). Moreover, Phoenician does not allege that Ms. Swope breached any fiduciary duty. Accordingly, we must not confuse the qualified immunity analyses associated with actions *brought by estate*

*beneficiaries* with the qualified immunity analyses of actions *brought by third parties.*[6]

As to the latter, i.e., third party claims, it is generally agreed that a bankruptcy trustee may be sued in his or her individual capacity for wrongful acts which exceed the scope of his or her authority—i.e., a bankruptcy trustee may be personally liable for wrongful acts that are *ultra vires*. <u>See</u> <u>In re Solar Fin. Servs.</u>, 255 B.R. at 803)(citing <u>Grant v. Florida Power Corp. (In re American Fabricators, Inc.)</u>, 186 B.R. 526 (Bankr. M.D. Fla. 1995) (trustee loses his immunity if he acts in the "clear absence of all jurisdiction.")); <u>see also</u> <u>Schechter v. State of Illinois, Dep't of Revenue (In re Markos Gurnee P'ship)</u>, 182 B.R. 211 (Bankr. N.D. Ill. 1995) (personal immunity of trustees extends only to matters within the scope of their duties); <u>United States v. Sapp</u>, 641 F.2d 182, 184 (4th Cir. 1981).

Whether Ms. Swope acted wrongfully and *ultra vires* is the gravamen of Ms. Swope's enjoyment of qualified immunity.  Having discussed <u>Barton</u> and <u>Mosser</u>,

---

[6] Among the cases receiving scholarly attention in the context of a trustee's fiduciary duties and the applicable standard of care to avoid personal liability are: <u>Boullion v. McClanahan</u>, 639 F.2d 213 (5th Cir. 1981); <u>In re Johnson</u>, 518 F.2d 246 (10th Cir. 1975); <u>In re Marcus</u>, 2 F.Supp. 524 (W.D. Pa. 1932); <u>Evans v. Williams</u>, 276 F. 650 (6th Cir. 1921); in re Chicago Pac., Corp., 773 F.2d 909 (7th Cir. 1985); <u>Red Carpet Corp. v. Miller</u>, 708 F.2d 1576, 1578 (11th Cir. 1983); <u>Ford Motor Credit Co. v. Weaver</u>, 680 F.2d 451 (6th Cir. 1982); <u>Sherr v. Winkler</u>, 552 F.2d 1367 (10th Cir. 1977); <u>Hall v. Perry (In re Cochise College Park, Inc.)</u>, 703 F.2d 1339 (9th Cir. 1983); <u>Kalyna v. Swaine (In re Accomazzo)</u>, 226 B.R. 426 (D. Ariz. 1998); <u>Ebel v. King (In re Ebel)</u>, 338 B.R. 862 (Bankr. D. Colo. 2005); <u>Yadkin Valley Bank & Trust Co. v. Ling McGee, Trustee</u>, 5 F.3d 750 (4th Circ. 1993); <u>United States by Central Sav. Bank v. Lasich (In re Kinross Mfg. Corp.)</u>, 174 B.R. 702 (Bankr. D. Mich. 1994); <u>In re Chicago Art Glass, Inc.</u>, 155 B.R. 180 (Bankr. N.D. Ill. 1993); <u>In re Gorski</u>, 766 F.2d 723 (2d Cir. 1985); <u>Pereira v. Foong (In re Ngan Gung Restaurant)</u>, 254 B.R. 566 (Bankr. S.D.N.Y. 2000).

above, we now turn to the two cases presented by Phoenician as applicable legal authority for finding that Ms. Swope's conduct was wrongful and *ultra vires*: Teton Millwork Sales v. Schlossberg, 311 Fed. Appx. 145, (10th Cir. 2009)(nonprecedential) and Leonard v. Vrooman, 383 F.2d 556 (9th Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct.856, 19 L. Ed. 2d 985 (1968).

Teton Millwork involved an action brought by a third party against a court-appointed receiver. Teton Millwork, 311 Fed. Appx. 145, 146-7. In the context of a contentious divorce proceeding in a West Virginia Family Court, Schlossberg was appointed as receiver to collect assets in which the husband, Palencar, held an ownership interest. Id. By order of court, Schlossberg was "vested with actual legal and equitable title to and the right to obtain record title to and/or liens upon and/or actual physical custody and possession of all of the assets of [Palencar] (whether held by the said Respondent, either alone or jointly with any other person or entity, in his own name or in the name of any alias . . . or in the name of any other entity, including . . . Teton Millwork Sales ["TMS"]). Id. The court also "authorized and directed" Schlossberg to "take such action as may appear necessary or desirable to obtain ancillary jurisdiction of these proceedings in such other States . . . as may appear appropriate." Id. Thereafter, Schlossberg used "this authority to seize the assets of TMS, a corporation in which Palencar was a twenty-five percent shareholder." Id. Upon learning that its assets had been seized, TMS

filed suit in Wyoming state court asserting Schlossberg "committed abuse of process and fraud." Id.  The suit was premised on the allegation made by TMS that Schlossberg exceeded his authority as receiver "by seizing TMS's assets in Wyoming, as well as its proprietary information and mail, even though he knew that Palencar was only a twenty-five percent shareholder in TMS and that there was no evidence to justify piercing the corporate veil of TMS." Id.  TMS further alleged that Schlossberg made false representation to and threatened third parties in Wyoming regarding his legal authority to seize assets, when in fact Schlossberg failed to obtained ancillary jurisdiction in Wyoming, in contravention of the West Virginia court order. Id.

Schlossberg removed the case to Federal District Court, and moved for dismissal under Fed. R. Civ. P. 12(b)(1), (2), (3), and (6). Id.  The District Court granted the motion under Fed. R. Civ. P. 12(b)(2) and (6), on the grounds that "it lacked personal jurisdiction over Schlossberg and that TMS failed to state a claim because Schlossberg enjoyed absolute immunity as a court-appointed receiver." Id. TMS appealed to the U.S. Circuit Court for the Tenth Circuit, where only the Fed. R. Civ. P. 12(b)(6) grounds for dismissal was subjected to review.  Id.

The Tenth Circuit's analysis began by acknowledging that "a court-appointed receiver has absolute quasi-judicial immunity if he is faithfully carrying out the appointing judge's orders, because enforcing a court order is intrinsically

associated with a judicial proceeding." Id. at 150 (citing and quoting Valdez v. City & Cnty. of Denver, 878 F.2d 1285, 1288 (10th Cir. 1989)).  The court noted that such immunity requires that "the receiver must act within the scope of his authority in carrying out a court order."  Id. (citations omitted).  The court further noted that "because the quasi-judicial immunity of individuals such as court-appointed receivers is a derivative of judicial immunity, there is no immunity if the court or the receiver acts in the clear absence of all jurisdiction." (citing Turney v. O'Toole, 898 F.2d 1470, 1474 (10th Cir. 1990)(quoting Stump v. Sparkman, 435 U.S. 349, 357 (1978))(additional citations omitted).

The issue decided by the Tenth Circuit was whether TMS set forth a facially plausible claim that Schlossberg is not entitled to *absolute immunity*. Id. (emphasis added).  The court considered TMS's allegations that Schlossberg seized TMS's assets and mail despite Schlossberg's knowledge that Palencar was only a twenty-five percent shareholder in TMS and that there were no grounds to pierce the corporate veil, as sufficient (when assumed to be true) to establish that "Schlossberg exceeded the scope of his authority, because the West Virginia court order only vested him with the 'actual legal and equitable title to and the right to obtain record title to and/or liens upon and/or actual physical custody and possession of all of the assets of . . . Palencar.'" Id. at 150-51.  The court observed that "[w]hile the court order permitted Schlossberg to collect Palencar's assets even

if they were held in the name of another entity, including TMS, the court order did not grant Schlossberg authority to seize assets that did not belong to Palencar." Id. at 151. In fact, the West Virginia court order would be void for lack of jurisdiction as to any affected individuals or entities not parties to the divorce proceeding, Id. The Tenth Circuit concluded, in light of the fact that the state court order granted Schlossberg authority only to secure Palencar's assets, that by taking TMS's assets "*absent any colorable evidence to justify piercing the corporate veil of TMS in such a fashion*, then he exceeded the scope of his authority by not acting in accordance with the court order and *would not enjoy absolute immunity*." Id. (emphasis added). The court noted, "After all, *unless there is some evidence that TMS was simply Palencar's alter ego*, then Mr. Schlossberg must respect TMS's status as a separate entity." Id. at n.3. (emphasis added). Apparently, the Tenth Circuit was prepared to entertain "colorable evidence justifying" Schlossberg's overreaching beyond Palencar's twenty-five percent interest in TMS, had there been such evidence.

The Tenth Circuit proceeded to examine TMS's allegation that Schlossberg exceeded the scope of his authority by committing fraud. Id. The court concluded that TMS set forth allegations satisfying the requisite degree of particularity pursuant to Fed R. Civ. P. 9(b), including allegations that Schlossberg, despite knowing that "he had no jurisdiction to exert judicial authority in Wyoming,"

- 33 -

knowingly made false statements to TMS agents that he was "in a position of judicial authority over TMS" and that he "was vested with title to all the assets, property, mail and confidential business and corporate information of TMS." Id. The court concluded that such "allegations, accepted as true, are sufficient to survive a motion to dismiss because perpetuating a fraud is not "intrinsically associated with a judicial proceeding." Id.

Despite reversing and remanding the matter, the Tenth Circuit explained that "[t]he foregoing analysis certainly does not resolve the issue of whether Schlossberg will ultimately enjoy absolute immunity." Id.  After explaining that its inquiry was limited to whether TMS's complaint alleges facts sufficient to establish that it is plausible that Schlossberg does not enjoy absolute immunity, the court proceeded to acknowledge that "in many cases it may be clear on a motion to dismiss whether absolute immunity applies, [however] in this case that issue must be resolved in further proceedings, once the parties have had the opportunity to develop the facts through discovery." Id.  To be clear, upon a review of the materials available to it at the motion to dismiss stage, the Tenth Circuit "conclude[d] that TMS has adequately pleaded that Mr. Schlossberg was not 'acting in accordance with and under *the protection of a court order*.'" Id. (emphasis added)(quoting T & W Inv. Co. v. Kurtz, 588 F.2d 801, 802 (10th Cir.

Okla. 1978)(finding receiver entitled to immunity and therefore dismissing suit as not cognizable under 42 U.S.C. § 1983)).

This Court recognizes that Teton Mills has been cited as one of the very few examples of a trustee acting *ultra vires*. Indeed, Phoenician would have this Court interpret the foregoing opinion as establishing as a matter of law that seizing property belonging to a third party is defacto *ultra vires* and therefore precludes a trustee from enjoying any form of immunity.   Unfortunately, Teton Mills is an example of how citations purporting to reflect a legal principle, when applied in haste, can metastasize in the frail body of case law on the topic.   Phoenician fails to address the full story of the Teton Mills dispute.   Indeed, on remand, the District Court conducted a bench trial and ultimately concluded that that TMS's claims were meritless, and, alternatively, that they were time-barred under West Virginia law and *that Schlossberg was entitled to immunity*.   Thereafter, the matter came before the Tenth Circuit for a second time.   Teton Millwork Sales v. Schlossberg, 2011 U.S. App. LEXIS 20718, *2-3 (10th Cir. Wyo. Sept. 29, 2011)(unprecedential).   The Tenth Circuit affirmed the District Court's merits determination and therefore did not find it necessary to address the alternative determinations. Id. at *3.

Accordingly, what can be garnered from Teton Mills is that the Tenth Circuit regarded immunity determinations as contextual, requiring a fact-specific

inquiry.    The Tenth Circuit originally concluded that the District Court was required to arrive at a more complete set of facts in order to determine whether the receiver (Schlossberg) acted wrongfully and in excesses of the authority of the state court order.   On remand, after conducting a factual inquiry, the District Court found that Schlossberg was entitled to qualified immunity.[7]   The District Court's finding that Schlossberg was entitled to immunity was not addressed by the Tenth Circuit on the subsequent appeal.

Considering the present matter before this Court, unlike the receiver in Teton Mills (Schlossberg), no credible evidence permitting any plausible inference that Ms. Swope engaged in any fraudulent conduct, or that she acted with malice or any ulterior motive, has been produced.   Rather, the undisputed fact is that the Trustee was charged with the duty of safeguarding the Estate Property—even though Phoenician may have held a leasehold interest in it.[8]   Further, unlike Schlossberg, there are no issues of ancillary jurisdiction regarding the conduct of Ms. Swope, there is no issue of whether Ms. Swope exceeded or abused the authority conferred by an order of court, and there is no dispute that Ms. Swope's

---

[7]   This Court notes in passing that, while the issue during the initial appeal was whether the trustee was entitled to *absolute immunity*, on remand the District Court found that the trustee was entitled to *qualified immunity*.

[8]   Parenthetically, the Court observes that the Lease Agreement itself provides that Phoenician was required to provide the lessor with access to the premises so that it could be inspected and/or repaired. See Lease Agreement at Section 6(A).   By not providing the Trustee with the key to the interior doors, it appears that it was Phoenician that may have been in breach of its duties to the Trustee.

duties prescribed by the Bankruptcy Code as a Chapter 7 Trustee include protecting and preserving the Estate Property.  As such, unlike Teton Mills, there is no dispute over whether Ms. Swope is authorized by federal statute to secure and preserve the Estate Property and is protected by qualified immunity for her exercising her business judgment with respect to the same.

In Leonard v. Vrooman, 383 F.2d 556 (9th Cir. 1967), cert. denied, 390 U.S. 925, 19 L. Ed. 2d 985, 88 S. Ct. 856 (1968), Todd was a debtor with assets located in a building, which prior to bankruptcy, Todd leased from Patterson. Id. at 558. Vrooman was appointed as receiver of the bankrupt estate. Id. at 557.  Patterson's proof of claim attached a copy of the lease with a $150 monthly rental amount. Id. at 558.  After Vrooman tried unsuccessfully to locate Patterson and Todd, in the company of the local constable, he took possession of the premises, posting notices regarding his name, possession, authority, and location. Id.  Vrooman then placed his own locks upon the doors. Id.  Vrooman was subsequently appointed as trustee of the estate, and upon examining the county records, he discovered that the deed to the building was transferred from Todd to Patterson as recorded one month prior to Todd's petition date.  The deed itself reflected that the transfer occurred in September of 1963.  Vrooman also identified a record of the transfer of the building from Patterson to Leonard on the same day as Todd's petition (April 27, 1964), that Todd had executed a trust deed on the property in favor of an insurance

company in January of 1964, and that Todd had made representations in a financial

statement of February of 1964 that he owned the property. Id.  As the Circuit Court

noted "[o]bviously, the trust deed was executed after the transfer to Patterson in

September, 1963, as was the financial statement." Id.

Leonard refused to voluntarily answer Vrooman's inquiries about the

transfers, and during a subsequent hearing before the Bankruptcy Court, Leonard

was unable to shed any light on the transfer from Todd to Patterson.  Id. After a

subsequent hearing on Vrooman's petition for an order to show cause, requiring

Patterson and Leonard to show cause why the property should not be sold by the

trustee free and clear of any claim by them, the Referee found in favor of Patterson

and Leonard and against Vrooman.  The Referee, on Vrooman's petition for order

to show cause, made the following finding of fact:

> 4. That said petitioner-trustee never acquired or had any right,
> title, claim or interest in or to said property since the filing of
> any petition in bankruptcy herein, and up to, and at the time of
> said hearing, and then had no right, title, claim, or interest in or
> to said property.

> The Referee at the same time entered the following conclusion of law:

> 2. That Respondent Robert Leonard is, and at all times herein
> was the sole owner of the parcel of property last above
> described, including the above building therein, subject only to
> the claim of Respondent, Mrs. Robert Leonard, his wife, thereto
> as community property, and entitled to the possession thereof.

Leonard v. Vrooman, 383 F.2d 556 at 559.

Leonard subsequently filed suit in the Municipal Court of Riverside County, California against Vrooman personally and against his surety for $12.00 a day damages for the duration of Vrooman's occupancy, for a total of $4,296.00. Id. Leonard alleged that the damages sought resulted from Vrooman violating his duties as receiver and trustee upon taking and retaining possession of Leonard's real property. Id.  At Vrooman's request, the Referee restrained prosecution of the state court suit, and a subsequent motion by Leonard to discharge the restraining order was denied. Id.  On appeal, the U.S. District Court for the Southern District of California affirmed the Referee and adopted *in toto* the findings of fact and conclusions of law filed by the Referee on Petition for Review.  Id. at 560.  On further appeal, U.S. Court of Appeals for the Ninth Circuit reversed.

It is important to recognize that Ninth Circuit was addressing a jurisdictional issue:  "the question presented to this Court is *whether the Bankruptcy Court has jurisdiction* to enjoin the plaintiff from proceeding with an action in the state court against a trustee in bankruptcy and his surety where the plaintiff seeks damages for the trustee's seizure and possession of real property owned by the plaintiff." Id. (emphasis added).   Referring to the aforementioned findings of fact and conclusions of law by the Referee, the Ninth Circuit recognized that the building entered and possessed by Vrooman was not, in fact, estate property, noting that

"[t]he Referee specifically found and concluded that the trustee never at any relevant time had any right, title, claim, or interest in the property and that Leonard had all right, title, claim, and interest including the right to possession." Id. at 561. Bound by findings that the building was not estate property, the Referee lacked jurisdiction to enjoin Leonard from proceeding with the state court action. Id. It follows then that a trustee wrongfully possessing property which is not an asset of the estate may be sued for damages arising out of his illegal occupation in a state court without leave of his appointing court. Id. at 560. "Therefore, the injunction was improvidently granted, *the Referee being without the requisite jurisdiction*." Id. at 561. (emphasis added).

The Ninth Circuit did not address the underlying merits of Leonard's action against Vrooman. In fact, the court went so far as to state, with the respect to the circumstances supporting the reasonableness of Vrooman's suspicions about the transfers of the non-estate real property, that they "are really defenses (along with laches) that may be available to the trustee in the state court action." Id. at 560. While appearing sympathetic to Vrooman's concerns about the transfers, the Ninth Circuit was critical of the manner in which Vrooman acted upon those suspicions, noting that it was a mistake "to break into and seize possession of the real property belonging to Leonard, *when this property was not listed as an asset of the bankrupt's estate*" and failing "to relinquish possession of the real property when

he discovered that title was claimed by and recorded in the name of Leonard." Id. (emphasis added).  The court further noted that: "*Under the circumstances here involved*, the trustee initially could have and should have obtained a turnover order directing delivery to the trustee of the personalty which was an asset of the bankrupt estate." Id. (emphasis added) (citing 2 Collier, Bankruptcy § 23.10 (14th ed. 1966)).  Likewise, regarding Varmoon's suspicions regarding fraudulent or preferential transfers, "an action could have been brought by the trustee against those claiming title, to have the conveyance of title to them set aside." Id. (citing Bankruptcy Act § 60(d), (e), 11 U.S.C. § 96(d), (e); Bankruptcy Act § 67, 11 U.S.C. § 107.)  The Court pointed out that "[i]n neither case would it have been *necessary* for the receiver-trustee to have taken possession of the real property here involved without first having obtained an order of the Court specifically directing him to do so." Id. (emphasis added)

Despite what Phoenician might wish this Court to adopt from Leonard v. Vrooman, the case is informative to the limited extent that it recognizes the following:  where a trustee, without prior court approval, enters and changes the locks on a building that is neither listed as an asset of the estate, nor is in fact an asset of the estate by virtue of being owned by a third party, the bankruptcy court lacks jurisdiction to enjoin a suit by the third-party building owner against the trustee from proceeding to a forum with proper jurisdiction over the matter.

But the import of <u>Leonard v. Vrooman</u> is not applicable to the facts *sub judice*. First, and perhaps most significantly, there is no dispute that the building entered by Ms. Swope and to which the locks were changed, was an asset of the estate. Unlike Leonard (the plaintiff in <u>Leonard v. Vrooman</u>), Phoenician is not a third-party owner of the building at issue and was merely a lessee. Rather, ownership has for all times material hereto been vested in the Trustee. As such, the Trustee owned a property interest which she was entitled to protect as well. Second, unlike <u>Leonard v. Vrooman</u>, there is no jurisdictional question presented, because the building is an asset of the estate, and Phoenician is not seeking approval to pursue a cause of action in another forum. While, these distinctions are sufficient to vitiate the applicability of <u>Leonard v. Vrooman</u>, there is another critical distinction—namely, the undisputed presence of exigent circumstances confronting Ms. Swope.

As noted above, the Ninth Circuit was careful to acknowledge that its holding was framed "under the circumstances" presented in <u>Leonard v. Vrooman</u>. This Court agrees that determining a trustee's personal liability (or immunity from suit) must include a careful consideration of the specific circumstances of each case. Given the dearth of case law on the topic, it comes as no surprise that neither the parties nor this Court have been able to identify a case that is squarely on point while presenting facts without relevant distinction from those *sub judice*.

However, it is worth discussing the case of <u>Wells Fargo Fin. Leasing, Inc.</u> <u>v. Jones</u>, 2015 U.S. Dist. LEXIS 37572, 1-3 (W.D. Ky. Mar. 25, 2015), which did address facts similar to those presently before this Court.

In <u>Wells Fargo Fin. Leasing, Inc. v. Jones</u>, Blackrock Investments, LLC ("Blackrock") owned a building and real property located in Murray, Kentucky (the "Blackrock Property"). SE Book Company, LLC ("SEB") maintained leased computer equipment within the Blackrock Property. SEB agreed to lease certain computer servers and software from VAR Resources, Inc. ("VAR"), <u>Id</u>. at *2. VAR subsequently assigned its interest in the lease to Wells Fargo Financial Leasing, Inc. ("Wells Fargo"). <u>Id</u>. Following a default by SEB, Wells Fargo brought suit against two individual guarantors of SEB's obligations to VAR. <u>Id</u>. C.A. Jones Management Group, LLC ("CAJM") moved to intervene, claiming tortious interference with prospective business advantage and conversion against Wells Fargo. Id. at *3. CAJM subsequently amended its complaint asserting claims against additional defendants including, Joe Cohoon ("Cohoon"), alleging that Cohoon tortuously interfered with its business relationship with a bank, intentionally dispossessed CAJM of its property, and was negligent. <u>Id</u>. It is not clear from the background set forth in the opinion what title or position Cohoon held. CAJM premised its claim on the basis that Cohoon changed the locks to the

Blackrock Property without giving notice to CAJM and permitted others to remove property belonging to CAJM from the premises.  Id. at *7.

The District Court addressed Cohoon's motion to dismiss CAJM's claims against him based upon the lack of subject-matter jurisdiction and a failure to state a claim. Id.  The court noted that SEB was the debtor in a chapter 7 bankruptcy case pending in the United States Bankruptcy Court for the Western District of Kentucky, and Blackrock was the debtor in a chapter 7 bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Tennessee. Id. at *5 n.2.  According to the District Court, Cohoon's motion "hinges upon whether CAJM's claims against Cohoon are precluded by the Barton doctrine due to related bankruptcy actions." Id. at *5.  The Court began by noting that, with respect to the exception provided by 28 U.S.C. § 959(a), "[a]s a sister court has noted, this limited exception 'is intended to permit actions redressing torts committed in furtherance of the bankrupt's business operations, and is not cast to foster interference '[with] the use, control, maintenance and operation of the bankrupt's property . . . .'" Id. (quoting In re Am. Associated Sys., Inc., 373 F. Supp. 977, 979 (E.D. Ky. 1974)). The court further noted that "[m]erely collecting, taking steps to preserve, and/or holding assets, as well as other aspects of administering and liquidating the estate, do not constitute 'carrying on business' as that term has been

judicially interpreted." Id. (quoting In re DeLorean Motor Co., 991 F.2d 1236, 1241 (6th Cir. 1993).

With respect to CAJM's allegations that Cohoon changed the locks to the property without giving notice to CAJM, and permitted others to remove property belonging to CAJM from the premises, the court recognized that such actions were taken by Cohoon "to preserve the assets of the bankruptcy estate." Id. CAJM claimed that the Barton doctrine does not apply to Cohoon "because he was not acting as the trustee, a court-appointed officer, or a court-approved officer." Id. at *7. The District Court, however, stated that "[i]t would be a grave mistake to limit the Barton doctrine only to cases in which a trustee or his professional is a named party to litigation. . . . In evaluating the limits of the Barton doctrine, the Court looks to the purpose and potential effect of the Complaint and the plausibility of the claims it asserts against persons closely associated with the Trustee." Id. at *7-8. (quoting In re Hindu Temple & Cmty. Ctr. of Ga., Inc., 502 B.R. 881, 890 (Bankr. N.D. Ga. 2013). The District Court placed great significance on the fact that "The declarations filed by the [SEB and Blackrock] Trustees underscore that the locks were changed to the property at their direction and access to the property was granted by Cohoon as directed by the Trustees." Id. The District Court's partial recital of the affidavits submitted by the respective trustees in the SEB and Blackrock bankruptcy cases, as set forth in its opinion, are as follows:

- 45 -

[By the SEB Trustee:]

2. On or about October 7, 2012, I was appointed as the Chapter 7 Trustee for the bankruptcy estate of SE Book Company, LLC ("SEB"), in the United States Bankruptcy Court for the Western District of Kentucky, Case[] No. 12-50954-thf.

3. Shortly after my appointment, I toured a building and real property located at 306 Andrus Drive, Murray, Kentucky (the "Blackrock Property") with Charles Jones. This building was owned by Blackrock Investments, LLC.

4. Maintained within the Blackrock Property was certain computer equipment leased by SEB ("SEB Computer Equipment").

5. In furtherance of my duties as Chapter 7 Trustee for SEB, I immediately took steps to secure the SEB Computer Equipment.

6. Around this time, I was introduced to Joe Cohoon.

7. I directed Mr. Cohoon to maintain control of and oversight over the SEB Computer Equipment.

8. At my direction, Mr. Cohoon restricted access to the SEB Computer Equipment to appropriate individuals, including other bankruptcy trustees for estates, creditors, and authorized vendors who copied data residing on the SEB Computer Equipment in order to preserve evidence and information related to the operations of SEB. At all such times, Mr. Cohoon reported to me regarding access to the SEB Computer Equipment and received my approval before granting access.

9. Mr. Cohoon's actions in securing and keeping watch over the SEB Computer Equipment were performed in furtherance of my authority and my obligations as Chapter 7 Trustee to secure

all property, assets and collateral subject to security interests of creditors of SE Book Company, LLC.

[By the Blackrock Trustee:]

2. On or about November 13, 2012, I was appointed as the Chapter 7 Trustee for the bankruptcy estate of Blackrock Investments, LLC ("Blackrock"), in the United States Bankruptcy Court for the Middle District of Tennessee, Case No. 3:12-bk-10404.

3. Shortly after my appointment, I became aware of Blackrock's ownership of a building and real property located at 306 Andrus Drive, Murray, Kentucky ("the Blackrock Property").

4. I immediately took steps to secure the Blackrock Property and all equipment and assets contained inside.

5. Around this time, I was introduced to Joe Cohoon.

6. As I am located in the Nashville area and Mr. Cohoon resided in the Murray, Kentucky area, I requested Mr. Cohoon's assistance in securing the Blackrock Property.

7. I directed Mr. Cohoon to change the locks at the Blackrock Property.

8. I directed Mr. Cohoon to maintain control of and oversight for the Blackrock Property while an assessment of the assets held therein was performed.

9. At my direction, Mr. Cohoon restricted access to appropriate individuals, including other bankruptcy trustees for estates whose property was held at the Blackrock Property, creditors, and ultimately potential buyers of the Blackrock Property. At all such time, Mr. Cohoon reported to me regarding access to the Blackrock Property and received my approval before granting access.

> 10. Mr. Cohoon's actions in securing and keeping watch over the Blackrock Property were performed in furtherance of my authority and my obligations as Chapter 7 Trustee to secure all property and assets of Blackrock Investments, LLC.

<u>Wells Fargo Fin. Leasing, Inc. v. Jones</u>, 2015 U.S. Dist. LEXIS 37572, *9-11 (W.D. Ky. Mar. 25, 2015).

The District Court concluded that "Cohoon acted as an agent of the Trustees to assist in furtherance of their duties to collect and preserve the assets of the bankruptcy estate. . . [therefore] the claims asserted against Cohoon are essentially claims against the Trustees, and this Court lacks jurisdiction over these claims under the Barton doctrine." <u>Id</u>. at *11.  The court went on to reiterate that "CAJM's claims against Cohoon necessarily relate to the Trustees' efforts to preserve assets of the bankruptcy estates." <u>Id</u>.  Despite the fact that "CAJM alleges that the property seized by Cohoon was *wrongfully* seized" the District Court concluded that because "Cohoon's actions were taken at the behest of the Trustees as part of the Trustees' duties to secure the property and assets comprising the bankruptcy estates," then "CAJM's claims asserted against Cohoon are precluded by the <u>Barton</u> doctrine." <u>Id</u>. at *12-13 (emphasis added).

The fact that the District Court in <u>Wells Fargo v. Jones</u> did not delve into whether the Trustees' actions (taken through Cohoon), including changing the locks—an action specifically alleged by CAJM to have been wrongful and without

notice to CAJM—warranted an *ultra vires* inquiry, speaks volumes.   It was

obvious to the District Court, just as it is obvious to this Court, that a Chapter 7

Trustee has a duty to secure and preserve estate assets, including changing the

locks to a building when circumstances warrant.   The fact that the Blackrock

Trustee had the locks changed, even without notice to CAJM whose property was

inside the building, when done in furtherance of a duty to control access to the

property for the benefit of those to whom the Blackrock Trustee owes such a duty,

did not raise an *ultra vires* concern for the District Court.   Likewise, even when

providing a most generous interpretation to Phoenician's allegation that Mr. Focht

changed the lock "in conspiracy" with Ms. Swope, having been done in the context

of permitting Ms. Swope to access and oversee the property in fulfillment of her

duties as a Chapter 7 Trustee, the Court finds this not to be *ultra vires*—neither in

the jurisdictional context of <u>Barton</u> nor in the context of assessing Ms. Swope's

claim of immunity under the circumstances presented.

## VI.

The Court concludes that the circumstances presented in the matter *sub

judice*, do not afford Ms. Swope absolute immunity, given that Ms. Swope was not

acting in furtherance of a court order or its equivalent.   Rather, Ms. Swope is

afforded qualified immunity.   Ms. Swope acted in furtherance of her statutory duty

to administer and preserve the estate and did not violate any fiduciary duty owing

to a beneficiary of the estate.  There also is no evidence that Ms. Swope acted with

malice or ulterior motive.[9]  As such, Ms. Swope acted as a reasonable Chapter 7

trustee would act under the circumstances, and she is protected against suit by

qualified immunity.   Under these circumstances, it is appropriate to grant the

Motion and dismiss the adversary proceeding as to Ms. Swope.

An appropriate order shall be entered.

Dated:  October 5, 2015            __/s/   Jeffery A. Deller_____

                                   JEFFERY A. DELLER

                                   Chief U.S. Bankruptcy Judge

cc:    All counsel and parties of record

---

[9]   Conclusory allegations of a conspiracy are not enough to support the Plaintiff's claims, especially in the context
of Section 1983 claims. Slotnick v. Staviskey, 560 F.3d 31, 33 (1st Cir. 1977)(citing, among other cases, Fletcher v.
Hook, 446 F.2d 14 (3d Cir. 1971).